THE JUDGES OF THE ONEIDA COMMON PLEAS *v.* THE
PEOPLE *ex rel.* SAVAGE. 18 Wend. 79.

The original action in the Common Pleas, in this case was *trover*, for the conversion of 14 *saw logs,* brought by *Esther Sanford* v. *Savage,* the relator. The title of the plaintiff to the premises was not controverted on the trial : but she *proved* that the land on which they were cut, had been assigned to her by her children by *parol,* as her *dower*. A verdict was found in her favor for $4 50, damages, and six cents costs. The Common Pleas, on her application, made an order granting her costs on the ground, as above stated " that the title to land had come in question upon the trial of the cause." The defendant obtained an *al-*

*ternative mandamus* to vacate this order for costs; and on the return setting forth these facts, a demurrer and joinder, the Supreme Court, Nelson Ch. J., awarded a peremptory mandamus. In his brief opinion (see 18 Wend. p. 80, 81,) he says : ·

"The title to land did not come in question. This proof as to the *title*, in the first instance, being altogether immaterial and to become material only, by way of answer to the defence, could not be volunteered with a view to costs. It was not in the power of the defendant to compel the plaintiff to prove her title to the land in the first instance, as in the case of *Hubbell* v. *Rochester*, 7 Cow. 115. Her right to the logs was shown independently of it.

"Again : the *possession* of the plaintiff, from 1826 down to the suit in 1835, was enough without showing her title to the premises."

Peremptory mandamus granted accordingly.

Upon this decision, a writ of error was sued out as before mentioned in the name of the Judges of the Oneida Common Pleas, and on the argument the question was raised whether the Supreme Court had jurisdiction by mandamus to compel the Common Pleas to vacate their order.

After advisement, opinions were delivered by Chancellor Walworth and Senator A. H. Tracy.

The Chancellor, in his opinion, goes fully into the question " whether the Supreme Court was right in supposing that it appeared from the return to the alternative writ, that the title to land did not come in question upon the trial of the cause before the Common Pleas."

" That the plaintiff gave her title .in evidence, he says is beyond all dispute. Whether it was possible for her to show the logs to be her's in any other way—is a question which I am not prepared to answer, from the facts stated in this return. If she could not, then it is certain her title to the land was in question according to my decision in the case of *Hubbell* v. *Rochester*, which was afterwards confirmed by the Supreme Court. p. 84, 85.

At page 81, he says, " It will be seen from this statement of the case, that the question whether the title was material to be shown on the trial in the Common Pleas, was a question of fact, rather than a question of law arising from un-

disputed facts. It appears to me, therefore, that there was no question of law involved in the decision of the Common Pleas: and that whatever authority the Supreme Court may have to correct errors of this kind in mere matters of law, it was the intention of the legislature to make the court before which the cause was tried, the sole judges whether the title to lands came in question, if the decision depended on disputed facts.

" From my conclusion on this point, it is not necessary to the decision of this case that I should examine the question of jurisdiction raised here; and I should prefer to delay a decision thereon, until it could be more fully argued, on one side at least, than was done in the present cause. I must be permitted to say, however, that the mode of proceeding by mandamus, under the present statutory provisions upon the subject, is a very inappropriate remedy to correct mere errors of judgment, either as to law or fact, in courts of general common law jurisdiction."

" It is true the legislature have amended the statute which made it absolutely necessary for the Supreme Court to give judgment for costs against parties to whom a peremptory mandamus was directed, and has left such costs in the discretion of the court. But the defendants in such cases, the judges of the inferior courts, are still liable to the relator for all damages he may sustain by reason of their neglect to comply with the alternative mandamus (?) although they may have returned facts which they supposed were sufficient to justify them in point of law, for not reversing their former decision, and they are also liable to the costs of a writ of error, to this court, if the Supreme Court decides in their favor, and this court happens to differ with the Supreme Court on the question presented by the return. Without intending to express any opinion whatever upon the *general question of jurisdiction*, therefore, 1 shall vote for a reversal of the judgment of the Supreme Court, because I am not perfectly satisfied that the title to land did not necessarily come in question upon the trial in the Common Pleas, and at all events that it was a question of fact in this case, upon which their decision, *when acting judicially under the positive direction of a statute should have been considered as conclusive*."

Though the Chancellor thus desired to adjourn the question of jurisdiction by mandamus, it was not declined by one of the law members of the court. It was taken up by Senator Tracy, who delivered a long opinion upon it. He seems

not to have been troubled with any doubts or misgivings as to his state of preparation to decide it. He did not, like the Chancellor, prefer to delay a decision upon the question of jurisdiction until it could be more fully argued. He says:

" My mind was principally interested on the argument of this case by the question whether the decision of the court of Common Pleas that the title to lands came in question on the trial of the cause, is not such a judicial decision by a court of competent jurisdiction for the purpose, that the Supreme Court could not, in the exercise of its legitimate functions, review it by a writ of mandamus. As the conclusion to which I have arrived on this point, makes it unnecessary to decide or discuss the other points of the case, I shall confine my present remarks wholly to it."

He then proceeds, after some general remarks upon " the decisions made in the early history of the Supreme Court," with which to our great relief he informs us, that he " fully concurs," to enter into an examination of the nature and objects of the writ of mandamus. We cannot think that we deprive the learned professional reader of any very useful or curious learning, if we decline to follow the honorable senator through his somewhat eccentric route of research. In his, what was evidently intended to be, elaborate examination of the case of *The People ex rel. Oelricks* v. *The N. Y. Superior Court,* the display is much more like senatorial debate than judicial reasoning. Not that we differ in fact, at all from his conclusion as to the unfitness of the remedy by mandamus, in that particular case. But, so far as his attack upon the first proposition laid down in that case by Ch. J. Savage, is concerned, viz: " that a writ of mandamus lies where a party has a legal right and no other appropriate remedy," he seems to us feeble in his logic when he is intelligible, and when he is metaphysical, immeasurably incomprehensible. He wishes to represent the learned Ch. J. as maintaining by this proposition that " in *every case* where the party has no other remedy, a mandamus will lie." And certainly, if the Ch. Justice had laid down any such doctrine, the senator's refutation would have been triumphant and complete. But Ch. J. Savage has advanced no such

proposition. And though Senator Tracy seems greatly puz-
zled and perplexed to define "what is a *legal* right?" p. 98,
we find no help—no light whatever in his opinion upon the
question. Is it really so difficult so abstruse and indefinable
a quiddity? We had supposed a legal right meant a right
which the law so recognizes as a *perfect right* that, if vio-
lated, the party may have redress for the violation by some
appropriate writ, or other proceeding either now in use, or if
necessary, to be devised by the proper court; as the "*offici-
na justitiæ.*"

But it is very evident to us that Mr. Senator Tracy had
not any fixed or certain notion of the limits of this jurisdic-
tion, at the outset of his opinion; and he does not seem to
acquire any more precise one, as he advances. We cannot
say of it, in this respect, "*crescit eundo.*" He very properly
says (p. 92) "The broad distinction between a direction to
an inferior tribunal to *act*, and direction to it *how to act*,
seems to have at all times been well observed." (In the
Court of King's Bench.) But then, as an instance of that
court's declining to direct the inferior court how to decide, he
cites that ill used, misunderstood case of *The King* v. *The
Justices of Derbyshire*, 4 T. R. 448, as in point, to show
that the King's Bench refused a mandamus to compel the
Sessions to *receive an appeal* from an assessment of Com-
missioners of enclosure. (The senator states it as an ap-
peal in regard to *poor rates*, but that is not material.) Now,
both in the case in 4 T. R. 488, just cited, and in the case of
*The King* v. *The Justices of the North Riding of York-
shire*, 3 T. R. 150, cited in it, the King's Bench did refuse
the writ of mandamus, and on the same ground in both,
viz: that the appellants moved the court for leave to "lodge
the appeal and *respite the hearing* thereof to the then next
quarter sessions." The Sessions ordered that the motion for
lodging the appeal *and respiting the hearing* thereof to the
next quarter sessions, be rejected. And on the rule to show
cause against a mandamus to "direct them to receive hear,
and determine the appeal;" what say the court? Why,
simply this: "The court were of opinion that the justices
had not acted wrong: for the motion was in effect to *adjourn
the appeal*, and it was evidently the intention of the parties

not to enter the appeal unless the court would adjourn it. The justices are to judge of the *reasonableness of the time;* and in some counties they establish a rule regulating the time of notice. Here, they add, there was sufficient time for the appellants to give notice and to come prepared to try it; and the justices, *who are to judge* of this thought so," p. 151, and the rule was discharged.

Now, so far from having refused a mandamus in either of these cases to the sessions to *receive* an appeal, the court expressly put their refusal upon the ground that the motion was to receive and *adjourn;* of which latter they say "this, the justices are to judge of." But these cases are both authorities to prove, if any were needed, that the King's Bench would have granted the writ at once, if the motions to *receive only,* had been denied by the Sessions. See to the same effect the case of the *King* v. *The Justices of Herefordshire,* 3 T. R. 504.

Equally unfortunate is the learned senator in his statement of the point decided in the case of *Rex* v. *The Justices of Devon.* He thus states it:

"More recently, in *Rex* v. *Justices of Devon,* 1 Chitty's Rep. 34, the court refused to compel a quarter sessions to *enter continuances,* saying our powers are great, but they are not unlimited; they are bounded by some lines of demarcation; we are not aware that we have power to interfere with the court below in the way suggested."

Now instead of the court refusing to compel the sessions to *enter continuances,* the court say not one word about the matter. It is the every day practice of that court to order the Sessions "to *enter continuances,* and to hear and determine appeals" which they have quashed without hearing on *the merits.* The application in this case of *Rex* v. *The Justices of Devon,* was for a mandamus to enter continuances on an appeal, and *also to alter the judgment* of the Quarter Sessions as recorded, by making a *special entry upon the record* of the reasons of their judgment.

Not one word is said in the very few which Abbott, Ch. J.

44

used in giving the judgment, of any doubt about their power to order the justices to *enter continuances,* if the other branch of the application could be granted.   The continuances are a more formal entry.   But on the other part of the applica- tion, to enter their reasons on the record, Abbott, Ch. J, said : "No instance has been cited in which this court by manda- mus ever ordered a *court* of inferior jurisdiction *to* give their *reasons* for their particular judgment.   All that we have been in the habit of doing is to order them to hear and de- cide cases which they have refused to hear.   I disclaim any power to compel the Sessions to give the reasons for their judgments."

In the case of *Ex parte Morgan,* 2 Chitty, 250, he states the point correctly enough ; the court there said : " we can- not in this manner review the proceedings of the judge of an inferior court, or try upon affidavit, any alleged irregularities in his judgment.   If there is an erroneous judgment given, a writ of error will lie to rectify it, if error lies ; but we can- not tell the judge what he is to do.   Every inferior court is the proper judge of its own practice."

This seems to have been the sole  principle on which the Supreme Court of Pennsylvania, in the case of the *Com- monwealth* v. *Judges of Common Pleas of Philadelphia County,* 3 Binney, 273, proceeded.

But we do very much doubt if there is any thing in that case to warrant Mr. Senator Tracy's statement of the reason he puts into the mouth of the court as the *sole* ground of their decision, when he says—" it decided that a mandamus would not lie to re-instate an appeal which they had dis- missed, *because* a mandamus cannot go to an inferior court compelling them to make a particular decision, but merely to decide."   Ch. J. Tilghman does, it is true, state that gen- eral principle, and cites the case of *United States* v. *Law- rence,* 3 Dallas, 42.   And he does say, 'upon this principle it would be improper to issue it; the Common Pleas have already decided according to the dictates of their best judg- ment.'   But he adds in the next sentence.   "But there is another reason decisive against the motion.   It is conceded by the counsel who made it, that if a writ of error lies in this

case, a mandamus ought not to issue. It appears to me that a writ of error does lie." Yeates J. concurred in this view, expressly declining any opinion on the other point. This case, as to the question whether if even a writ of error would lie in such a case, a mandamus might not still be an appropriate remedy, will be the subject of a brief inquiry hereafter. At present, as we have, it is believed presented a full view of the case of the *Oneida Judges*, and of the grounds on which Mr. Senator Tracy, puts the question of jurisdiction by mandamus over the proceedings of inferior tribunals we shall merely give the resolution adopted by the Court of Errors on reversing this case of the Oneida Common Pleas, and then very briefly review the cases of this jurisdiction, since decided by the Supreme Court.

The resolution adopted by the Court of Errors was as follows. 18 Wend. 106.

" On the question being put, *shall this judgment be reversed*," all the members of the court (22 being present) voted in the affirmative.

" Whereupon the following *resolution* was *unanimously* adopted :

" Resolved, that in this case the Supreme Court had no jurisdiction by *mandamus* to review the decision of the court below, certifying that the title to land came in question on the trial."

It certainly cannot be imputed to the judges of the Supreme Court that they did not bow with sufficient reverence to this decision of the court of dernier resort. On the contrary, it would seem they hastened to recede as much too far within the proper limits of their jurisdiction, after this decision, as they had before incautiously wandered beyond them.

This observation however, cannot apply to the first reported case which came before the whole court : *The People ex rel. Orlando Fuller and Mary Fuller* v. *The Judges of the Oneida Common Pleas*, 21 Wend. 20, which was decided at the January Term, 1839. Mr. Justice Bronson, who delivered an opinion, goes somewhat into the case to show that the Common Pleas erred in their decision. The

case was presented upon the return to an alternative manda-
mus to the Common Pleas commanding them to *vacate their
order setting aside a report of referees,* which return was
demurred to. Upon the return it appeared that the relators
husband and wife, were sued as *joint contractors,* before a
justice of the peace for a debt due from the wife *dum sola ;*
that they were not described in the process or declaration
as husband and wife, nor did they or the bill of particu-
lars before the justice contain any allegation of their cover-
ture. The proof however, having established their liability
as husband and wife, and judgment having been rendered
against them by the justice, they appealed to the Common
Pleas, where the cause was referred. The referees on the
hearing, excluded evidence of the indebtedness of the wife
to the plaintiff prior to her marriage with the other defend-
ant, and also rejected the proof offered of a subsequent pro-
mise by the husband to pay the account, and reported
nothing due from the defendants. The Common Pleas on
the plaintiffs motion, set aside the report.

The court, Bronson J. delivering their opinion, held that
the Common Pleas had erred in setting aside the report:
that as the declaration before the justice was in the usual
form against joint contractors without any allegation that
the relation of husband and wife existed between them, the
proof should be confined to such a joint demand.

But he says—" The relators have another remedy, and
that is a ground for denying a mandamus. On a *rehearing*
if the referees follow the decision of the Common Pleas, and
decide against the relators, the question can be put upon the
record and reviewed by writ of error. Since the decision of
the court for the correction of errors in *The Judges of the
Oneida Common Pleas* v. *The People,* 18 Wend. 79, I
think the case of *The People* v. *The Niagara Common
Pleas,* 12 Wend. 246, ought not to be followed. I do not
adopt *all the reasoning* of Senator Tracy in the case recent-

ly decided, but rest my opinion on the single ground that the
relators have another remedy.*

"The Chief Justice concurred in the above views."

And so we also beg leave to concur ; but not by any means
with the conclusions of Cowen, J. who not only concurred
that the Common Pleas erred and that mandamus was not
the appropriate remedy, but he takes occasion to maintain that
" supposing there was no remedy by writ of error, and sup-
posing *The People ex rel. Fleming* v. *The Common Pleas
of Niagara,* to have been a solemn decision upon the point
under discussion, still I must be permitted to question our
power to interfere, since the decision of the Court of Errors
in the *Judges of the Oneida Common Pleas.*

" The *resolution* in that case, (says Mr. Justice Cowen in
a strain of eulogy for which we were not prepared from so
determined a hunter of cases,) " was after a very elaborate and
able view of our power by Mr. Senator Tracy, who has
cited most of the English and American cases." We have
already seen *how* he has *cited* them ; and it has cost us, as
it will no doubt the learned reader, no small share of a good
stock of patience to expose those *citations* as wholly inac-
curate in almost every instance ; some of them pressed into
the support of a *general proposition,* which they do on their
very face refute. Cases thus carelessly and loosely *cited* by
judges of high courts in this way, when reported become
for years, false beacons, misleading the bench and the bar,
till finally when investigated, they are discovered to have
been totally wrested from their original purport, and then

---

* *Note* by the reporter. " This case was decided in January Term, 1839,
since which time the question of the proper office of a *mandamus* has been
more fully considered by the court, and the views of Senator Tracy, (as ex-
pressed in the case of the *Oneida Common Pleas,* 18 Wend. 79,) recognized
as the *true rule* on the subject, as will be seen in an opinion delivered by Mr.
Justice Bronson, in the *People ex rel. Doughty* v. *The Dutchess Common
Pleas,* 20 Wend. 658, which although *published* previously to the decision of
this case, was in fact pronounced subsequently." p. 22, 23.

See case of *The People* v. *Dutchess Common Pleas,* referred to in the
above note, *post.* 351.

comes one of those *bouleversements* that are made a reproach to our whole system of jurisprudence. It is for this reason, as we believe, that those great judges whom we are most accustomed to reverence are generally as sparing as possible in sprinkling their decisions with cases ; and never those of doubtful authority and application. Mr Justice Cowen, adopting, however, without the least reserve, all the *cases cited* by Senator Tracy as accurately stated, comes to the following conclusion as the result of that senator's profound research upon the question of jurisdiction.

" For one, if I have not entirely mistaken the scope of the decision in the *Judges of the Oneida Common Pleas* v. *The People,* I shall not feel myself warranted in consenting to a mandamus for the purpose of *disturbing any judicial decision whatever*, of an inferior *court or magistrate.*" p. 25.

This is the broad, indiscriminate renunciation of all control by mandamus over all the judicial action of inferior courts and magistrates which we are combating ; although as to this particular case of *The People ex rel. Fullers*, there can be no doubt, without reference to the resolution of the Court of Errors, in the case of *The Oneida Judges* v. *The People,* that the mandamus was very properly refused. The case of *The Niagara C. P.* was simply following out the principle of the previous case of the New York Superior Court, in 5 Wend.

The case of the *People ex rel Werckmeister* v. *The Judges of the New York Superior Court*, 20 Wend. 663, decided at the special term, December, 1839, was a case, where Mr. Justice Bronson refused a mandamus to require the Superior Court to correct a case settled by them upon a special report of referees, to be inserted as a state of facts in the record, with a view to the questions of law which the relator desired to review on error. The same observations precisely apply to it as to the case of *The People ex rel. Fullers* v. *The Oneida Judges.*

We next come to the case in which Mr. Justice Bronson is said by the reporter as we have seen, to have " more fully considered the question of the proper office of a writ of mandamus, and to have recognized the views of Senator Tracy." And in reviewing that case, if we shall go into a more ex-

tended notice of the authorities, and more in detail than may at first appear necessary, we hope the learned reader will pardon us for the particularity, as we have just seen how dangerous is the practice of citing cases by wholesale statement. The general proposition we intend to establish is, that the Supreme Court has and of right ought to have, and has not by the *resolution* in the *Oneida C. P.* v. *The People,* been deprived of, the power of controlling a certain class of judicial decisions or proceedings, which it has since that resolution, disclaimed. In other words, while we maintain that Mr. Justice Bronson, ought not to have interfered by mandamus in the case of the Suffolk C. P. (ante, p. 334,) we hope to show that he might and ought, on the other hand, to have granted the writ, in the case to which we now address ourselves.